UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WISCONSIN CENTRAL LTD., | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 10243 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| GRAND TRUNK WESTERN RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 10244 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| ILLINOIS CENTRAL RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 10246 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**M‎EMORANDUM O‎PINION AND O‎RDER**

In these consolidated and materially identical suits, Plaintiffs Wisconsin Central Ltd.,

Grand Trunk Western Railroad Company, and Illinois Central Railroad Company seek refunds

for allegedly overpaid federal employment taxes under the Railroad Retirement Tax Act

("RRTA"), 26 U.S.C. §§ 3201-3241. Doc. 1. (Unless indicated otherwise, all docket numbers refer to *Wisconsin Central Ltd. v. United States of America*, No. 14 C 10243). The parties filed cross-motions for summary judgment on a set of stipulated facts. Docs. 23, 25. Plaintiffs' motions are denied and the Government's motions are granted.

### Background

The parties agree that the court should rely on a jointly submitted set of stipulated facts in deciding the summary judgment motions. Doc. 22 at 2; *see Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 573 (7th Cir. 2014); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001); *Mkt. Street Assocs. L.P. v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991). Plaintiffs are rail carriers as defined by the RRTA, 26 U.S.C. § 3231(g). Doc. 22 at ¶ 6. Plaintiffs have significant railroad operations in the Midwest and Mississippi Valley, and are indirect wholly owned subsidiaries of Canadian National Railway Company. *Id*. at ¶¶ 8-9.

This case concerns the tax years 2006 through 2013. *Id*. at ¶¶ 3, 22. During that time, pursuant to Canadian National's Management Long-Term Incentive Plan and Illinois Central's Executive Performance Compensation Program, Plaintiffs granted options of Canadian National stock to certain employees. Id. at ¶¶ 22, 26(a), 29(c). The options were "nonqualified" stock options, meaning that they were not incentive stock options as defined in 26 U.S.C. § 422(b) or part of an employee stock purchase plan as defined in 26 U.S.C. § 423(b), which in turn means that they were not "qualified stock options" as defined in the RRTA, 26 U.S.C. § 3231(e)(12). *Id*. at ¶ 22. Each option gave the employee the right to purchase one share of Canadian National stock at a fixed price equal to the stock's publicly traded price on the date of the option grant ("exercise price"). *Id*. at ¶ 23(a). If an option was not exercised within a ten-year term, or possibly earlier if an employee retired or died, it expired. *Id*. at ¶¶ 23(a), 26(f). (The options of

any employee dismissed for cause or who voluntarily left Plaintiffs expired immediately. *Id*. at

¶ 26(f).) Twenty-seven percent of the options exercised from 2006-2013 were "performance"

options, exercisable only if Canadian National attained certain financial performance

benchmarks in a given year, while the remaining seventy-three percent were exercisable without

regard to corporate financial performance or other constraints. *Id*. at ¶ 25.

In lieu of the Social Security taxes paid by non-rail employers and employees under the

Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101 *et seq.*, railroad employers

and employees pay taxes under the RRTA. Doc. 22 at ¶ 7. Unlike FICA, the RRTA imposes

two tiers of taxes, with Tier 1 providing benefits and taxes in a manner almost identical to FICA,

and Tier II functioning like a private pension plan, tying its benefits to any individual employee's

"earnings and career service." 26 U.S.C. § 3201. Tier 1 taxes are statutorily linked to FICA:

> In addition to other taxes, there is hereby imposed on the income of each [rail
> carrier] employee a tax equal to the applicable percentage of the compensation
> received during any calendar year by such employee for services rendered by
> such employee. For purposes of the preceding sentence, the term "applicable
> percentage" means the percentage equal to the sum of the rates of tax in effect
> under [FICA].

26 U.S.C. § 3201(a). The RRTA defines "compensation" as "any form of money remuneration

paid to an individual for services rendered as an employee to one or more employers." 26 U.S.C.

§ 3231(e)(1). Much as RRTA tax rates are statutorily linked to FICA, Treasury Department

regulations define RRTA compensation by reference to FICA, providing that under the RRTA,

"[t]he term compensation has the same meaning as the term wages in section 3121(a) [FICA] …

except as specifically limited by the" RRTA. 26 C.F.R. § 31.3231(e)-1. FICA in turn defines

"wages" as "all remuneration for employment, including the cash value of all remuneration

(including benefits) paid in any medium other than cash," subject to several inapplicable

exceptions. 26 U.S.C. § 3121(a).

The dispositive issue here is whether the non-qualified stock options that Plaintiffs awarded to their employees are a "form of money remuneration" and thus "compensation" under the RRTA. Doc. 22 at ¶ 2. In their initial tax payments for the years at issue, Plaintiffs treated each exercised option as income for federal income tax purposes and compensation for the purposes of the RRTA, in the amount by which the publicly traded share price of Canadian National on the exercise date exceeded the exercise price for each option exercised. *Id.* at ¶ 23(c). Plaintiffs now believe that was a mistake. Wisconsin Central seeks refunds for the 2007-2011 and 2013 tax years in the amount of $205,327.49, Doc. 1 at ¶ 1; Doc. 22 at ¶ 3; Grand Trunk Western seeks refunds for the 2006-2012 tax years in the amount of $515,589.58, Doc. 22 at ¶ 3; Doc. 1 (14 C 10244) at ¶ 1; and Illinois Central seeks refunds for the 2006-2013 tax years in the amount of $12,600,958.82, Doc. 22 at ¶ 3; Doc. 1 (14 C 10246) at ¶ 1.

Similar suits have been filed in recent years. *See BNSF Ry. Co. v. United States*, 775 F.3d 743 (5th Cir. 2015); *Union Pac. R.R. Co. v. United States*, No. 8:14-cv-00237, slip op. (D. Neb. Jul. 1, 2016) (reproduced at Doc. 35-1); *CSX Corp. v. United States*, No. 3:15-cv-00427 (M.D. Fla. filed Apr. 3, 2015). In the two judgments issued thus far, the Fifth Circuit in *BNSF Railway* and the District of Nebraska in *Union Pacific* both upheld the Treasury Department's interpretation of "any form of money remuneration" to include non-qualified stock options. For the following reasons, this court reaches the same result.

### Discussion

The parties agree that this case is governed by the framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Doc. 24 at 13; Doc. 26 at 10; Doc. 27 at 7; Doc. 28 at 4. Plaintiffs therefore have forfeited, if not waived, any argument that *Skidmore*, *Auer*, or some other deference regime applies. *See G & S Holdings*

*LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.").

"At *Chevron*'s first step, [the court] determine[s]—using ordinary principles of statutory interpretation—whether Congress has directly spoken to the precise question at issue." *Coyomani-Cielo v. Holder*, 758 F.3d 908, 912 (7th Cir. 2014). If "Congress has directly spoken to the precise question at issue … the court … must give effect to the unambiguously expressed intent of Congress," *Indiana v. EPA*, 796 F.3d 803, 811 (7th Cir. 2015) (quoting *Chevron*, 467 U.S. at 842-43) (ellipses original) (internal quotation marks omitted), and end the inquiry there, *see Coyomani-Cielo*, 758 F.3d at 912. "If, however, 'the statute is silent or ambiguous with respect to the specific issue,'" *Chevron*'s second step, at which "a reviewing court must defer to the agency's interpretation if it is reasonable," comes into play. *Indiana v. EPA*, 796 F.3d at 811 (quoting *Chevron*, 467 U.S. at 843-44). Significantly, "there is a difference—which may be important in some *Chevron* cases—between clear meaning and the best of several interpretive choices." *Coyomani-Cielo*, 758 F.3d at 914. If Congress has not directly spoken to the issue, it "has left the administrative agency with discretion to resolve a statutory ambiguity," and so the court must defer to an agency's reasonable interpretation of the statute. *Ibid.* (internal quotation marks omitted); *see also Indiana v. EPA*, 796 F.3d at 811.

# I.   *Chevron* Step One

"The cardinal canon of statutory interpretation is that" a court "look[s] first to the text of the statute." *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 622 (7th Cir. 2015) (quoting *Conn. Nat'l Bank v. German*, 503 U.S. 249, 253 (1992)).  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)) (internal quotation marks omitted); *see also United States v. Titan Int'l, Inc.*, 811 F.3d 950, 952 (7th Cir. 2016).  "In the absence of statutory definitions," the court "accord[s] words and phrases their ordinary and natural meaning and avoid[s] rendering them meaningless, redundant, or superfluous." *CFTC v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (internal quotation marks omitted).  "Statutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Ibid.* (internal quotation marks omitted).  "Indeed, statutory interpretation is a holistic endeavor and, at a minimum, must account for the statute's full text, language as well as punctuation, structure, and subject matter." *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996); *see also Estate of Moreland v. Dieter*, 576 F.3d 691, 699 (7th Cir 2009).

The RRTA does not define the term "any form of money remuneration."  The question here is whether that term is limited to money itself—meaning fiat currency like dollars or pounds, or even virtual currency like Bitcoin—or whether it also includes other items of value and, if so, whether those items include non-qualified stock options.

The Seventh Circuit has held that dictionary definitions are of only limited use in statutory interpretation. *See Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 643 (7th Cir. 2014) (en banc) ("Dictionaries can be useful in interpreting statutes, but judges and lawyers must take care not to 'overread' what dictionaries tell us.") (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014)) (citation omitted); *United States v. Costello*, 666 F.3d 1040, 1043-44 (7th Cir. 2012) ("[D]ictionaries must be used as sources of statutory meaning only with great caution. … Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context."). Still, both parties cite dictionary definitions to support their competing readings of the statute. Plaintiffs cite definitions of "money" as "something generally accepted as a medium of exchange, a measure of value, or a means of payment," or "a current medium of exchange in the form of coins and banknotes; coins and banknotes collectively," and argue that those definitions clearly exclude property, such as the Canadian National stock options, "without a fixed pecuniary value, whose monetary value fluctuates over time … and which is not accepted as a medium of exchange or payment." Doc. 24 at 17; *see* "Money," *Merriam-Webster* (2016), https://perma.cc/452T-2GPS; "Money," *Oxford Dictionaries* (2016), https://perma.cc/EZX3-2PJG. The Government responds by citing the *Oxford English Dictionary*, which defines "money" as a "means of payment considered as representing value or purchasing power; … [h]ence: property, possessions, resources, etc., viewed as having exchangeable value or a value expressible in terms of monetary units," and therefore that money does not "always or only mean 'cash money.'" Doc. 26 at 11 (quoting "Money," *Oxford English Dictionary* (2016), https://perma.cc/Z5TG-2KKF). *Black's Law Dictionary* provides various definitions, narrow and broad, including a "medium of exchange authorized or adopted by a government as part of its currency"; "[a]ssets that can be easily

converted to cash"; and "[c]apital that is invested or traded as a commodity." *Black's Law Dictionary* 1096 (9th ed. 2009).

At common law, "money" was defined largely in the negative, as goods and instruments that were by legal fiction not subject to the principle of *nemo dat qui non habet*, Latin for "he who has not cannot give." James Steven Rogers, "Policy Perspectives on Revised U.C.C. Article 8," 43 *UCLA L. Rev.* 1431, 1461-62 (1996). Because applying that principle strictly would interfere with the smooth functioning of the economy, Lord Mansfield held that once a financial instrument is "treated as money, as cash, in the ordinary course and transactions of business, by the general consent of mankind, which gives them the credit and currency of money to all intents and purposes," it effectively *is* money and is therefore not subject to principles that applied to non-money property, such as repossession by a former owner. *Miller v. Race* (1758) 97 Eng. Rep. 398, 401 (KB); *see also Murray v. Lardner*, 69 U.S. (2 Wall.) 110, 118-19 (1864) (discussing *Miller v. Race*); James Steven Rogers, "The New Old Law of Electronic Money," 58 *SMU L. Rev.* 1253, 1256 (2015) ("*Miller* held that Bank of England notes, which were not at the time formally legal tender, were governed by the same rules as money itself.").

As the Fifth Circuit noted in *BNSF Railway*, these disparate "definitions of 'money' are less than helpful" in determining the meaning of the statutory term "any form of money remuneration." 775 F.3d at 752. Because *Chevron*'s first step directs attention to the "unambiguously expressed intent of Congress," the fact that the word "money" has several reasonable definitions—and that the statute itself provides that "money remuneration" has multiple "form[s]"—strongly suggests that the term "any form of money remuneration" is subject to multiple reasonable interpretations as well. At the very least, dictionary and common law definitions do not on their own provide an unambiguous statutory meaning.

8

The same holds for the RRTA's structure; indeed, if anything, the statutory structure favors the Government's reading over Plaintiffs'. The "commonsense canon of *noscitur a sociis* … counsels that a word is given more precise content by the neighboring words with which it is associated." *Worth*, 717 F.3d at 550 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). Under that canon, "the fact that several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Id.* at 550-51 (internal quotation marks omitted). Statutory language is thus given meaning "with an eye toward 'the company it keeps.'" *Id.* at 551 (quoting *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995)). "While not an inescapable rule, this canon is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *McDonnell v. United States*, 136 S. Ct. ___, 2016 WL 3461561, at *13 (U.S. June 27, 2016) (internal quotation marks omitted).

After defining "compensation" as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers," § 3231(e)(1) specifically excludes four forms of payment from the meaning of "compensation":

> Such term does not include (i) the amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which makes provision for his employees generally (or for his employees generally and their dependents) or for a class or classes of his employees (or for a class or classes of his employees and their dependents), on account of sickness or accident disability or medical or hospitalization expenses in connection with sickness or accident disability or death, except that this clause does not apply to a payment for group-term life insurance to the extent that such payment is includible in the gross income of the employee, (ii) tips (except as is provided under paragraph (3)), (iii) an amount paid specifically—either as an advance, as reimbursement or allowance—for traveling or other bona fide and necessary expenses incurred or reasonably expected to be incurred in the business of the employer provided any such payment is identified by the employer either by a separate payment or by specifically indicating the

> separate amounts where both wages and expense reimbursement or allowance are combined in a single payment, or (iv) any remuneration which would not (if [FICA] applied to such remuneration) be treated as wages (as defined in section 3121(a)) by reason of section 3121(a)(5).

26 U.S.C. § 3231(e)(1). These exceptions do not apply here, but the fact that Congress felt it necessary to include the first exception—which covers employer-provided health and disability insurance—suggests a relatively broad scope of the term "money remuneration." Congress would have had no need to carve that exception if it did not consider such insurance to otherwise be a "form of money remuneration." *See United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1400 (2014) (holding that an express "exemption" for severance payments in FICA "would be unnecessary were severance payments in general not within FICA's definition of 'wages.'"). Yet employer-provided insurance is not a medium of exchange or a means of payment, and thus falls outside the narrow definition of "money remuneration" urged by Plaintiffs. "The specificity of th[is] exemption[]" thus "reinforces the broad nature of" the RRTA's definition of "money remuneration." *Ibid.*; *see also Univ. of Chi. v. United States*, 547 F.3d 773, 775 (7th Cir. 2008) (noting that that the FICA term "'wages' … is broadly defined but followed by specific exceptions").

Section 3231(e)(12) contains an additional exclusion for qualified stock options from the definition of "compensation." *See* 26 U.S.C. § 3231(e)(12). Like health and accident disability insurance, a qualified stock option is neither a medium of exchange nor commonly understood as synonymous with "cash money." It follows that interpreting "any form of money remuneration" to be limited to fiat or virtual currency, as Plaintiffs urge, would improperly render the exclusion of qualified stock options "meaningless, redundant, or superfluous." *Worth*, 717 F.3d at 550 (internal quotation marks omitted); *see also In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015) ("The canon against surplusage is strongest when an interpretation would render

superfluous another part of the same statutory scheme.") (quoting *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013)) (internal quotation marks omitted); *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 651 (7th Cir. 2011) ("In general, canons of statutory construction urge courts to interpret statutes in ways that make every part of the statute meaningful.  Interpretations that result in provisions being superfluous are highly disfavored.") (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)) (citation omitted).  Moreover, "where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied in the absence of evidence of a contrary legislative intent." *United States v. France*, 782 F.3d 820, 825 (7th Cir. 2015) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)), *vacated on other grounds*, 136 S. Ct. 582 (2015).  Thus, the explicit exclusion of *qualified* stock options strongly suggests not only that the term "any form of money remuneration" includes stock options in general, but also that only qualified stock options and not *non-qualified* stock options are to be excluded.

Plaintiffs contend that construing "any form of money remuneration" to refer to anything other than cash money would render the term "money" superfluous.  Doc. 24 at 15.  The Government responds that understanding the term to refer only to cash money would improperly read "any form of" out of the statute, and that the words "any form of" would themselves be unnecessary if "money remuneration" referred only to actual cash.  Doc. 26 at 11.  Plaintiffs retort that "any form of" refers to different forms by which Plaintiffs may convey money to their employees, including hourly wages, overtime pay, per-mile or piecework pay, weekly or monthly salaries, bonuses, or commissions.  Doc. 27 at 11.  The court need not resolve this dispute, because both positions are plausible—providing further support for the notion that the statutory meaning is not clear.  *See Coyomani-Cielo*, 758 F.3d at 912-13 (holding that a statute is

ambiguous for *Chevron* purposes when "neither [party's] interpretation is obviously required by the statute and both interpretations arguably read words out of the statute").

Considering the RRTA's subject matter likewise does not point decisively in favor of Plaintiffs' interpretation. "[D]ifferent acts which address the same subject matter, which is to say are *in pari materia*, should be read together such that the ambiguities in one may be resolved by reference to the other." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 990 (7th Cir. 2001); *see also United States v. Sanders*, 708 F.3d 976, 993 (7th Cir. 2013) (noting that "another 'longstanding' canon of statutory interpretation is 'construing statutes *in pari materia*'") (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987)). Often, the "tricky issue when applying this canon is determining when different statutes should be regarded as addressing the same topic," *Firstar Bank*, 253 F.3d at 990, but the Seventh Circuit has expressly noted that the "Railroad Retirement Tax Act … is to the railroad industry what the Social Security Act is to other industries: the imposition of an employment or payroll tax on both the employer and the employee, with the proceeds used to pay pensions and other benefits." *Std. Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1373 (7th Cir. 1987); *see also Herzog Transit Servs., Inc. v. U.S. R.R. Ret. Bd.*, 624 F.3d 467, 471 (7th Cir. 2010) ("Employers and employees subject to the [the railroad] Acts must pay a payroll tax akin to the social security tax requirement of other employers and employees. These taxes [are] established by the Railroad Retirement Tax Act."). Other circuits have reached the same conclusion. *See BNSF Ry.*, 775 F.3d at 749-50, 754 & n.81 (citing *Standard Office Building*, 819 F.2d at 1373, collecting cases, and noting that "it is well-established that the RRTA and FICA are parallel statutes, and courts often look to FICA when interpreting the RRTA"); *N.D. State Univ. v. United States,* 255 F.3d 599, 604 (8th Cir. 2001) (calling the RRTA "the equivalent of FICA for railroad employees");

*Mont. Rail Link, Inc. v. United States,* 76 F.3d 991, 993 (9th Cir. 1996) ("The RRTA serves as the functional equivalent of the Social Security Act for railroad employers."); *Chi. Milwaukee Corp. v. United States*, 40 F.3d 373, 374 (Fed. Cir. 1994) ("RRTA tax is similar to the tax imposed by the Federal Insurance Contributions Act.").

Plaintiffs respond that the "conceptual similarity between the Social Security and Railroad Retirement *systems*, important as it is in many contexts, does not assist in the resolution of the instant case that turns on enforcement of specific statutory language in the RRTA." Doc. 27 at 8-9. But that is precisely the point of the *in pari materia* canon: "statutes addressing the same subject matter *generally* should be read as if they were one law," with the traditional tools of statutory interpretation applied accordingly. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (emphasis added). Thus, although FICA does not by completely define the RRTA's various contours, examining the former to elucidate related provisions of the latter is an acceptable mode of statutory interpretation given the close linkages between the statutes.

As noted, FICA defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," subject to several exceptions. 26 U.S.C. § 3121(a). That is broad language, and the Supreme Court recently reiterated "the term 'wages' in the Social Security statutory context to have substantial breadth." *Quality Stores*, 134 S. Ct. at 1400; *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 48 (2011) (noting that "Congress has defined 'wages' broadly" under FICA). Applying the *in pari materia* canon supports the proposition that just as courts construe FICA "wages" broadly, so, too, should they broadly construe RRTA "compensation."

Plaintiffs contend that because, "taking Tier 1 and Tier 2 taxes together," RRTA tax rates significantly exceed FICA tax rates, "it is completely understandable that Congress would be

more comfortable with a more restricted [RRTA] tax base … to help moderate the higher overall tax." Doc. 27 at 9 n.1. This argument fails for two reasons. First, Congress itself sets the tax rates. If Congress wanted to ensure a roughly equal tax burden for employers and employees in railroad and non-railroad jobs, "there was a much simpler, clearer, and more direct way for Congress to convey" that: by imposing equal tax rates, not by employing ambiguous statutory language that leaves open to reasonable debate the RRTA tax base. *Coyomani-Cielo*, 758 F.3d at 913. Second, given that only RRTA Tier 1 "provides benefits and taxes in a manner almost identical to FICA," *BNSF Ry.*, 775 F.3d at 750, Plaintiffs' inclusion of the RRTA Tier 2 taxes in their calculation results in a comparison of apples to oranges.

To be clear, the *in pari materia* canon does not establish that the term "any form of money remuneration" *unambiguously* encompasses the non-qualified stock options at issue here. As the Government acknowledges, Doc. 26 at 16, the RRTA and FICA, *in pari materia* or not, are not identical. They do use distinct terms to refer to the funds that provide the basis for their employer and employee taxes, and "the choice of substantially different words to address analogous issues signifies a different approach." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996). It therefore may be, as Plaintiffs argue, that the different phrasing "is one of the key differences" between the RRTA and FICA and their respective retirement tax systems. Doc. 27 at 7 (emphasis omitted). Yet this also does not provide for *Chevron* purposes an unambiguous meaning of the term. Rather, as with the contrasting dictionary definitions, the very fact that applying different canons, or even the same canon, can support different outcomes refutes the notion that Congress's "unambiguously expressed intent" aligns with Plaintiffs' interpretation of the term. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (holding that a statute did "not itself provide clear guidance" under *Chevron*

because reading the statute's words in context dictated a different result than reading them "in light of the canon against implied repeals"); *Coyomani-Cielo*, 758 F.3d at 913 ("In light of the foregoing analysis—which suggests some confusion, potential contradictions, and a much clearer way to make the point that Congress may have been trying to make—we cannot say that [the statute] is 'clear' at *Chevron*'s first step."); *Arobelidze v. Holder*, 653 F.3d 513, 518-19 (7th Cir. 2011) ("When, as here, there are two plausible but different interpretations of statutory language, there is ambiguity.") (internal quotation marks omitted).

Plaintiffs contend that the absence of a statutory definition for "money" in the RRTA and the Internal Revenue Code ("IRC") implies that the word must have "a commonly understood meaning outside the context of the Internal Revenue Code, and that its common definition and usage should apply throughout the Code, in the absence of any specific modification for a particular provision." Doc. 24 at 15-16. That argument elides the crucial issue. True enough, "[i]n evaluating statutory language, a court … 'giv[es] the words used their ordinary meaning.'" *Lewis v. Epic Sys. Corp.*, ___ F.3d ___, 2016 WL 3029464, at *2 (7th Cir. May 26, 2016) (quoting *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014)) (alteration in original); *see also Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) ("[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.") (internal quotation marks omitted). But as demonstrated above, the "ordinary understanding" of "any form of money remuneration" in the context of the RRTA is elusive. Moreover, although Plaintiffs cite several unrelated IRC provisions that appear to refer to "money" as a type of property, Doc. 24 at 16, 22; Doc. 27 at 12-13, the IRC definitional section, 26 U.S.C. § 7701, does not define the term, and nor does the IRC elsewhere refer to "money remuneration." Doc. 28 at 7. More important, none of the IRC provisions cited by Plaintiffs define the boundaries of the money subtype of property,

and so regardless of whether those provisions could be useful in interpreting the RRTA, they do not provide a clear definition for "any form of money remuneration." *See* 26 U.S.C. §§ 118(c) ("money or other property"), 317(a) ("property" includes "money, securities, and any other property"), 461(f) ("money or other property"), 465(b)(1)(A) ("the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity"), 1038(b) ("money and the fair market value of other property").

Plaintiffs also argue that the "common understanding" of money is that it "has a constant amount or denomination representing a specific stored value that can be applied to a future transaction." Doc. 24 at 16. They contrast this with non-money property, which "has no fixed value but is susceptible to varying valuations over time and subjectively in the hands of different holders." *Ibid*. That distinction lacks a statutory basis, as shown above, and it also fails as a matter of internal logic. Money, even assuming it is limited to fiat currency, is itself subject to varying valuations over time, through cycles of inflation or deflation or its fluctuation relative to foreign currencies. Monetary transactions are by their nature bilateral. For example, when a table—or a stock option—experiences a change in value, money does as well: if a formerly $100 table now costs $200, then $200, which was formerly valued at two tables, is now valued at one.

Or consider that, at the close of business on June 23, 2016, one British pound was worth $1.49, while the following day, after the Brexit vote, one pound was worth $1.37. *See* "Historical Rates for the GBP/USD Currency Conversion on 23 June 2016," *PoundSterling Live* (2016), https://perma.cc/ED2R-LAER; "Historical Rates for the GBP/USD Currency Conversion on 24 June 2016," *PoundSterling Live* (2016), https://perma.cc/K478-3PKU. In other words, on June 23, one dollar was valued at £0.67; the following day, it was valued at £0.73. The dollar's "specific stored value" had changed in all ways other than the number printed the banknote or

coin—which is to say, it had changed in all ways meaningful to the bearer, or to the employee receiving it as compensation. This is at the very least similar to the value of a stock option: it may fluctuate in value prior to exercise, but at the time of exercise it has a fixed monetary value, which provides the base on which Plaintiffs allegedly overpaid RRTA taxes.

To that point, it bears noting that railroads around the country, including Plaintiffs, until recently held the view that the non-qualified stock options *were* "money remuneration" under the RRTA and accordingly paid RRTA tax on them. Doc. 22 at ¶ 23(c); *BNSF Railway*, 775 F.3d at 746-47; Complaint at ¶¶ 2, 24, *CSX Corp.*, No. 3:15-cv-00427 (M.D. Fla.); Complaint at ¶¶ 2, 17, *Union Pac. R.R. Co.*, No. 8:14-cv-00237 (D. Neb.). The fact that highly interested parties with undoubtedly sophisticated tax counsel held this view against their own interests confirms, though no further confirmation is necessary, that, at a minimum, the statute is ambiguous.

Finally, Plaintiffs contend that the history of the Economic Growth Act of 1992, S. 2217 102d Cong. (1992), an ultimately unadopted amendment to the RRTA, provides support for their position that "any form of money remuneration" refers unambiguously to cash money. Doc. 27 at 10. In the Seventh Circuit, however, legislative history is not considered until the second step of the *Chevron* analysis. *See Coyomani-Cielo*, 758 F.3d at 914 ("[W]e realize that some of our sister circuits consider legislative history at [*Chevron* step one], but we prefer to save that inquiry for *Chevron*'s second step.") (citation omitted); *Emergency Servs. Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465 (7th Cir. 2012) ("In this Circuit, we seem to lean toward reserving consideration of legislative history and other appropriate factors until the second *Chevron* step.") (internal quotation marks omitted).

To summarize, the meaning of "any form of money remuneration" in 26 U.S.C. § 3231(e)(1) is not clear and unambiguous under *Chevron*.

## II.    *Chevron* Step Two

"At the second stage of the *Chevron* analysis, [the court] determine[s] whether the agency's interpretation is reasonable." *Coyomani-Cielo*, 758 F.3d at 914.  The court's "review at this stage is deferential; [the court] will uphold the agency's interpretation so long as it is 'a permissible construction of the statute.'" *Ibid.* (quoting *Chevron*, 467 U.S. at 843).  "If that [agency] interpretation is reasonable, it must be followed, regardless of whether or not the reviewing court would have come to the same conclusion." *Emergency Servs. Billing*, 668 F.3d at 466 (citing *Chevron*, 467 U.S. at 843 n.11).

The Treasury Department has the "general authority under 26 U.S.C. § 7805(a) to 'prescribe all needful rules and regulations for the enforcement' of the Internal Revenue Code." *Mayo Found.*, 562 U.S. at 56.  Treasury Regulation § 31.3231(e)-(1) provides that under the RRTA, "[t]he term compensation has the same meaning as the term *wages* in section 3121(a) [FICA] … except as specifically limited by the" RRTA.  26 C.F.R. § 31.3231(e)-1.  As noted, § 3121 defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash."  26 U.S.C. § 3121(a).  The Treasury's interpretation of the statute is reasonable.  As discussed at length above, the term "any form of money remuneration" in the RRTA is susceptible to a broad reading analogous to that of "wages" in FICA.  The structure of the RRTA, particularly the specific exclusions in 26 U.S.C. § 3231(e)(1) & (12), supports (but does not necessarily compel) a broad interpretation, as does the close relationship of the RRTA with FICA.  And recent Supreme Court decisions emphasize and reaffirm the broad reading of FICA's definition of "wages."  *See Quality Stores*, 134 S. Ct. at 1399-1400; *Mayo Found.*, 562 U.S. at 48.

Common sense also supports the reasonableness of Treasury's interpretation. Stock options are financial instruments. Unlike a car or home, they have very little, if any, intrinsic value to their holders beyond their monetary value. They are readily and regularly convertible into cash, distinguishing them from most non-money property. Although Plaintiffs accurately note that "[a]ny property, cash or non-cash, has a monetary value that can be estimated at any given point," Doc. 27 at 14 n.5, stock options, unlike many forms of non-money property, exist almost exclusively to be converted into cash. Further, the fact that reading "any form of money remuneration" to include non-qualified stock options eliminates the possibility that railroads could structure their compensation packages in such a way as to substantially reduce their RRTA tax burden provides further justification for finding that Treasury's interpretation is reasonable and permissible.

The legislative history cited by Plaintiffs does not render Treasury's reading unreasonable. The Economic Growth Act of 1992 was a bill that proposed to "conform the definition of compensation under the Railroad Retirement Act to that under the Federal Insurance Contributions Act." S. 2217 102d Cong. tit. XLI (1992). The bill did not progress beyond the Finance Committee and was not subject to a vote. *See* "S.2217 – Economic Growth Act of 1992," *Congress.gov* (2016), https://perma.cc/ZG2K-ZFVK. Plaintiffs contend that the bill's failure indicates that Congress "did not intend for the RRTA to be interpreted coextensively with FICA" and that if the Government's "interpretation of the RRTA were correct, this proposed amendment would have been unnecessary." Doc. 27 at 10.

As the Government correctly observes, however, "congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered

change." *United States v. Craft*, 535 U.S. 274, 287 (2002) (internal quotation marks omitted); *see also Lawson*, 134 S. Ct. at 1173 n.16 ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute.") (internal quotation marks omitted). Further, "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Paramount Health Sys., Inc. v. Wright*, 138 F.3d 706, 710 (7th Cir. 1998) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 348-49 (1963)). The Economic Growth Act of 1992 was proposed fifty-seven years after the term "any form of money remuneration" was first incorporated into RRTA. *See* 49 Stat. 974 § 1(d) (1935); *BNSF Ry.*, 775 F.3d at 755 & nn. 88-91 (reviewing the RRTA's legislative history). Its mere existence as an unenacted legislative proposal is certainly not enough to overcome the deference owed to Treasury's interpretation of the RRTA.

Plaintiffs retort that even if Treasury's interpretation of the RRTA is reasonable, the particular non-qualified stock options at issue here are not compensation under the RRTA because the phrase "money remuneration" is a "specific limit[ation]" in the RRTA that distinguishes RRTA compensation from FICA wages, 26 C.F.R. § 31.3231(e)-1. Doc. 24 at 18-20; Doc. 27 at 14-17. But Treasury does not interpret that phrase as a specific limitation, and its interpretation is reasonable. As discussed above, 26 U.S.C. § 3231 contains several enumerated exclusions, including one for qualified stock options, § 3231(e)(12). Plaintiffs protest that this "'rifle shot' option exclusion[]" was "designed to resolve specific treatment of those types of options, not others." Doc. 27 at 16 & n.6. That may be right as a historical matter, but it does not follow that Treasury's interpretation is unreasonable, and Plaintiffs err in seeking comfort from the Supreme Court's observation that "the statement that all men shall be treated as if they were six feet tall does not imply that no men are six feet tall." *Id.* at 16 (quoting *Quality Stores*,

134 S. Ct. at 1402).  A more appropriate analogy would be a statute that explicitly excludes men who were six feet tall; an agency interpretation that the statute did not exclude men who were 6'1" would be reasonable.

Plaintiffs make two additional arguments.  First, they contend that the Government's position that non-qualified stock options are "money remuneration" is an impermissible "post hoc rationalization" that the IRS had never offered until this case and others like it were filed.  Doc. 24 at 19.  But that interpretation certainly cannot be a post-hoc rationalization when the need to apply it had not presented itself before, in large part because Plaintiffs and other railroads themselves believed that the stock options fell within the RRTA's compensation provision and paid taxes in accordance with that belief.

Second, Plaintiffs and the Government dispute the relevance of IRS Revenue Ruling 69-391, 1969-2 C.B. 191, which held that railroad-furnished housing for certain foremen that had a fixed value was taxable compensation under the RRTA.  While Plaintiffs' reliance on this ruling has several weaknesses, including that it does not deal with stock options and was issued by the IRS rather than the Treasury Department, the biggest problem is that, under Seventh Circuit precedent, IRS revenue rulings are "entitled to respectful consideration, but not to the deference that the *Chevron* doctrine requires in its domain."  *First Chi. NBD Corp. v. Comm'r*, 135 F.3d 457, 459 (7th Cir. 1998) (citations omitted); *see also Wetzler v. Ill. CPA Soc'y & Found. Ret. Inc. Plan*, 586 F.3d 1053, 1058 (7th Cir. 2009) ("Revenue rulings are not binding on this Court and we give them the lowest degree of deference[,] which equates to some deference or respectful consideration.") (internal quotation marks omitted).  By contrast, Treasury's interpretation "is given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" or statute.  *United States ex rel. Garbe v. Kmart Corp.*, ___ F.3d ___, 2016 WL

3031099, at *9 (7th Cir. May 27, 2016) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).  Treasury's interpretation is not plainly erroneous or inconsistent with the regulation, and so it controls here.

## Conclusion

Plaintiffs' summary judgment motions are denied, and the Government's motions are granted.  Judgment in these consolidated cases will be entered in favor of the Government and against Plaintiffs.

July 8, 2016

_____
United States District Judge